CASE 23—BILL OF REVIEW—JANUARY 5.

# Baker vs. Grundy's heirs.

### APPEAL FROM HOPKINS CIRCUIT COURT.

1. A bill of review is limited to three years where there is no saving disability. In personal actions, when the bar begins to run, it runs on regardless of intervening disabilities.

2. In suits for land, if a litigant claimant die before his remedy is barred, and his successors by descent labor under disability at his death, the limitation is suspended. But if, in such case, the descent be cast on several, the running of the statute is not suspended, unless all of them labor under disability, in which case the suspension would continue as long as the disability of any one of them. (4 *Bibb*, 44; 5 *Litt.*, 37 ; 7 *Mon.*, 63.)

3. Where the decree was obtained by fraud, the limitation in equity commenced, not from the perpetration, but from the discovery of the fraud, provided the discovery was within a reasonable time.

4. See the opinion for facts constituting fraud in obtaining a decree for land.

HARLAN & HARLAN for appellants.

T. N. LINDSEY, for appellees, cited 5 *Dana*, 223 ; 5 *B. M.*, 364; 4 *Mon.*, 541 ; 8 *B. M.*, 367, 119 ; 5 *Litt.*, 36.

JUDGE ROBERTSON·DELIVERED THE OPINION OF THE COURT:

This is a bill of review to which the appellant pleads time as a bar. Without any saving disability, a bill of review, like a writ of error, is limited to three years. Cumulative disabilities are unavailing. In personal actions, whenever the bar begins, it runs on without regard to intervening disabilities; but in suits for land, if a litigant claimant die before his remedy shall have been barred by time, and his successor by descent labor under disability at the time of his death, the limitation is suspended during the period of the disability. But if, in such case, the descent be cast on several persons as parceners, claiming jointly, the running of the statute is not suspended, unless all of them labor under disability; and if all of them labored under disability, the suspension would continue as long as the disability of any one of them should continue. (*Macher vs. May*, 4 *Bibb*, 44; *McIntire's heirs vs. Funk's heirs*, 5 *Littell*, 37 ; *South's heirs vs. Thomas's heirs*, 7 *Mon.*, 63.)

Consequently, although Robert E. Grundy was an infant when the decree was rendered against him, yet, as he had attained majority about two years before his death, and his right descended to several heirs, some of whom labored under no disability, the disability of some of the other heirs did not suspend the running of the limitation as to any of them.

Nor is the error in failing to reserve to Robert E. Grundy time to open the decree after attaining 21 years of age now material on the question of limitation or any other question in

this case. Had there been any such decretal reservation, it would not have allowed more than one year; and he, in fact, had two years before his death, and did not avail himself of his right to reverse or open the decree.

But fraud in obtaining the decree presents the question of limitation in a different phase. In such case the limitation in equity commenced, not from the perpetration, but from the discovery of the fraud, provided that the discovery was, under all the circumstances, made within a reasonable time. The bill of review in this case charges that the decree sought to be reviewed was obtained by fraud, which was not discovered by Robert E. Grundy before his death, nor by his heirs until just before the filing of their bill to open and change the decree. If these allegations be true, the review is not barred by time, and, in the judgment of this court, they are true. There was apparent fraud, and this was not sufficiently developed until the appellant filed an answer in this case presenting exhibit (H), not disclosed or alluded to in the original suit, and alleged, as an excuse for not using it in that suit, *that he showed it to Towles, who was said Robert's guardian and counsel, and who, thereupon, consented to the decree as rendered without extending or altering the pleadings, so as to have a judicial consideration of that document.*

Without that paper there was no semblance of ground for the original decree; and, therefore, the decree was fraudulently obtained, if, as alleged by the appellant, it was obtained by showing the paper to Towles, who, as both guardian and counsel, controlled the defense; unless, as it literally and abstractly may import, it was *bona fide* evidence of a sale of the previously unsold residue of the "Christy survey," and for which the original decree was *thereon* obtained for about 720 acres of land.

On a full and careful consideration of all the facts, we are of the opinion that there was no such sale, and that the appellant, knowing this, made, according to his own allegations, a fraudulent use on the guardian of that specious writing, and thereby surreptitiously obtained an unjust decree for land he had neither paid for nor bought. The following facts, among

other minuter and corroborative circumstances, impel us to this conclusion as a decidedly preponderating probability on a question peculiarly vexatious :

1. Robert E. Grundy's father, William Grundy, owned the "Christy Survey" of 1400 acres, in Hopkins county. The appellant squatted on a portion of the land as early as 1815, and has continued to reside within the patent boundary ever since. He, some time after his first settlement, bought from Thompson 100 acres, for which Thompson held Wm. Grundy's bond for a title, which was assigned to the appellant in March, 1830. The title was to be made to Thompson on the payment of the consideration of $100, payable in 1830 and 1831. Before the year 1830, Wm. Grundy had sold to Thomas Price 200 acres in one corner of the "Christy Survey," and to which he conveyed to Price the legal title in 1837. Before the year 1828, W. S. Briggs had sold to the appellant 200 acres within the same survey, and, there being some dispute about the title, for which appellant held Briggs's bond, Briggs assigned to W. Grundy the bond he held on the appellant, on which Grundy obtained a judgment, which appellant enjoined for alleged want of title in Briggs, who, as well as Grundy, was made a party to the injunction suit. This controversy was settled, as between appellant and Grundy, by a compromise on the 26th of February, 1830, whereby it was agreed that the appellant should assign to Grundy, Briggs's bond for a title to the 200 acres, that Grundy's judgment against appellant was satisfied, and that Grundy should convey to appellant a designated portion of Christy's Survey to adjoin the said 200 acres, and also the 100 acres sold to Thompson ; and the surveyor testified that the boundaries of the portion so sold embrace 290½ acres of land. The boundaries, as described in the memorial of the compromise, are so general as to render the identity and quantity of the land included in them, *prima facie,* vague and doubtful; but yet an actual survey makes them so definite and certain as to leave no room for doubt that the reported plat embraces the land, and all the land, contemplated in the compromise. Nevertheless, in his original bill against the infant heir of William Grundy, after the death of the latter, who

lived until the spring of the year 1838, the appellant claimed a conveyance of the legal title to the whole of the " Christy Survey," excepting only the Briggs 200 acres, and *urged that claim on the compromise alone.* The decree for the whole on that single basis was palpably erroneous and greatly excessive on the face of the record, and never could have been rendered but on the guardian's consent fraudulently procured. This was so apparent, that, in one of the appellant's answers in this case, he sets up, *for the first time,* the writing marked (H), in in the following words:

" I have this day received of Miles Baker $800, which amount is in full satisfaction for the balance of the Christy Survey (more or less); and I hand the patent of said land to James Price to hold until the deed is made to the said Baker. In the presence of the undersigned witnesses, as witness my hand this 27th day of July, 1830.

" Witness—                                   WILLIAM GRUNDY.

" JAMES FARMER,

" JOSHUA $+$ SHORT."
    his
    mark

This receipt is an unusual memorial of a sale of land and a convenant to convey. It is also ambiguous and indefinite. What " balance " is meant? The writing itself furnishes no clue. When was the balance sold, and for what price? The receipt " in full" does not show. If the sum of $800 was paid at the date of the receipt, of which there may be much doubt, that might have been full payment for the land embraced by the compromise, and probably was, for there is neither proof nor allegation of any other payment for that land; nor is there satisfactory proof, or even any suggestion, that the replevin bond for about $600 was otherwise paid. The acknowledgment of payment in the compromise would be true, if it was a part of the consideration for the land embraced in the memorial of compromise; and this hypothesis is fortified by the following facts—1. On the 26th of July, 1830, one day before the date of the receipt, a credit in full is indorsed on the replevin bond as *paid* on that day; 2d. As there is nowhere any suggestion that Grundy owed the appellant anything, or

was paid one cent at or before the time of the compromise, what did he then get for the replevin bond, and for the 292½ acres of land which the appellant acquired by the compromise? 3d. The appellant has, nowhere, pretended that he paid more than the $800, and also $100 for the Thompson land of 100 acres; and, had he paid more, why did he never suggest it? The deposit of the patent with Price to hold "*until a deed*" should be executed, strongly implies that the only object was to survey the compromise boundary, calling for some of the patent lines and corners. Had the appellant bought all the balance of the Christy Survey not included in the compromise, the patent would have been delivered to him instead of a stakeholder, and to keep as his own muniment after, and not merely "*until*" the conveyance, which implies that then it was to be returned to Grundy, still the owner of it, and also of 720 acres of the land embraced by it, and who would, therefore, need it for the identification and future sale of that unsold residue.

Under these circumstances, and with these clues, however difficult or doubtful the true interpretation of the receipt (H) might be on its face alone, it seems to us that the only consistent construction of it is, that it does not mean that the appellant had bought from Grundy any more of the Christy Survey than the portion embraced in the compromise of February, 1830, and that "the balance" of that survey, as recited in the receipt, was intended to mean the balance of the compromise land after deducting the Briggs 200 acres and the Thompson 100 acres, *and which balance of the Christy Survey had not been otherwise paid for*. And this deduction is, as we think, made almost conclusive by facts to be hereinafter noticed. The use we now make of the foregoing considerations, is to show the pregnant significance of the otherwise unaccountable fact that, in his original suit, the appellant never exhibited or alluded to the receipt (H), which, if he then understood it as evidence of a sale of the whole of the Christy Survey, except 200 acres, he must have deemed indispensable to a just and irreversible decree for a title to the whole. The only consistent presumption is, that he then knew that it did not embrace any portion of the 720 acres, all outside of the compromise

boundary, and that, after the bill of review was found to be otherwise irresistible, he brought it in, for the first time, as a forlorn hope to prop an unjust decree fraudulently obtained.

2. The appellant never seemed to claim any portion of the 720 acres until after William Grundy's death, eight years after the date of the receipt (H); and Grundy claimed it, and was considered the only owner of it all the time. *And why did Baker never either survey this land or apply to Grundy for a conveyance of it?*

3. After the date of the receipt, Grundy often tried, *without question as to his right,* to sell portions of the 720 acres.

4. Only a few days before his death, Grundy, through an agent, did, by a verbal contract, actually sell about half of the 720 acres, *in the presence and with the assent of the appellant, who showed the land to the buyer as the land of Grundy, and never intimated any claim to it* or objection to the sale of it.

Without noticing other circumstances conducing to the same conclusion, we are, on the foregoing grounds, sufficiently satisfied that the decree of the circuit court now sought to be reversed by this appeal, is maintained by the record. The appellees, as R. E. Grundy's heirs, seem to be, as decreed, entitled to a restitution of the 720 acres conveyed to the appellant under the original decree.

Wherefore, the decree appealed from being to that effect, is affirmed.